## MEDDAUGH *v.* WILSON.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 10. Argued October 10, 1893. — Decided January 22, 1894.

It is a general principle of law that a trust estate must bear the expense of its administration.

Assignees in bankruptcy, although not in possession of the bankrupt's property, are nevertheless required to look out for the interests of all, and are entitled to compensation, the lack of possession being important only in determining the amount of the compensation.

A corporation in Michigan was the owner of a large and valuable real estate. Three successive mortgages on this property were created, and a large amount of corporation bonds secured by them were issued. Suits being begun for the foreclosure of these mortgages, a receiver was appointed by the court to take possession of and hold all the mortgaged property. The corporation was then adjudged to be a bankrupt. Assignees were appointed, who appeared by counsel in the foreclosure suits and contested them. The property remained with the receiver, and never passed into the possession of the assignees. Negotiations took place, looking towards a sale of the property and a reorganization, which contemplated that a certain proportion of shares in the reorganization should be delivered to W. In the course of the negotiations, the amount which the assignees were entitled to receive, and the amount which should be paid to their counsel, were determined, with the assent of all parties. W. agreed to pay this sum to D. for them out of the moneys to be received by him. These negotiations fell through. New negotiations then took

place, looking towards a different scheme for reorganization. Under these a decree of foreclosure was obtained, under which the property was sold to M. and W. No provision was made in the decree for the payment of the sums agreed to be due to the assignees and their counsel, but the court was informed that satisfactory arrangements had been made therefor. In the reorganization a large amount of stock was allotted to W., but not so much, in proportion to the full amount, as had been allotted to him by the previous arrangement. The claims of the assignees in bankruptcy being transferred to their counsel, the latter filed their bill in equity against W., to charge him as trustee with the payment of the claims of both assignees and counsel, by virtue of his holding the shares which had been allotted to him in the new company. A large amount of proof was taken, much of which is referred to by the court in its opinion, and, as the result of examination, it was *held*,

(1) That W. had assumed the payment of the claims of the assignees in bankruptcy and of their counsel, and that these claims were a lien in equity upon the stock of the new corporation in his hands;

(2) That W., having received in the final arrangement a less amount of stock than was awarded to him when the amount of the claims in litigation was determined, those claims were subject to be scaled down proportionately;

(3) And the majority of the court further held that, under the peculiar circumstances of the case, the plaintiffs should not be allowed interest.

THIS was a suit brought in the Supreme Court of the District of Columbia by the appellants, seeking to charge the defendant as trustee for them of 897 shares of the capital stock of the Lake Superior Ship Canal, Railway and Iron Company. The bill was filed June 6, 1881; the answer, September 13, 1881. Proofs were taken, and on April 5, 1887, a decree was entered dismissing the bill, which decree was affirmed by the general term on March 3, 1888. From that decree of affirmance an appeal was taken to this court.

The following are the undisputed facts in the case: The Lake Superior Ship Canal, Railroad and Iron Company was a corporation organized under the laws of the State of Michigan. On July 1, 1865, it issued bonds to the amount of $500,000, secured by a mortgage upon its property and franchises. Subsequently, and on July 1, 1868, it issued another series of bonds amounting to $500,000, also secured by mortgage, all of which two series of bonds were outstanding in the hands of *bona fide* holders at the date of the decree hereafter mentioned,

On the 1st day of July, 1870, it issued a third series of bonds, amounting to $1,250,000, also. secured by mortgage; $250,000 of which bonds were retired, and only $1,000,000 thereof. were outstanding at the time of said decree. On May 1, 1871, it executed to the Union Trust Company, as trustee, a mortgage deed to secure a further issue of bonds to the amount of $3,500,000, of which, however, only $1,300,000 were issued, and the remainder were in the custody of the Union Trust Company at the time of said decree.

Suits were brought to foreclose these several mortgages. While these suits were pending, and in August, 1872, the company mortgagor was adjudged a bankrupt in the District Court of the United States for the Eastern District of Michigan, and George Jerome and Fernando C. Beaman were appointed assignees, and the plaintiffs, Meddaugh & Driggs, their counsel. These assignees never took possession of any property, for all of it was in the hands of a receiver appointed by the Circuit Court in the foreclosure suits. They, however, through their counsel appeared in and contested the foreclosure suits. They also filed a bill in the nature of a cross-bill. Litigation was carried on for some years. On February 12, 1877, the several suits having been consolidated, a single decree was entered foreclosing all the mortgages. Pending the foreclosure proceedings, as appears from the terms of the decree, the receiver had, under the authority of the court, issued receiver's certificates to the amount of $625,300.

The principal creditors and security holders were J. C. Ayer & Co., J. Boorman Johnston & Co., Theodore M. Davis as receiver of the Ocean National Bank, and James C. Ayer and George C. Richardson, jointly. Certain English capitalists entered into negotiations for the purchase of the property. Don M. Dickinson was acting for the corporation, and interesting himself to bring about a closing of the litigation and a sale of the property to these English capitalists. On September 24, 1875, the four principal creditors above named entered into a written agreement with Dickinson, in which the amounts which each creditor was willing to accept were named; which provided that the parties should consent to a decree of fore-

closure, and an order for the sale of the mortgaged property as an entirety; that the securities should all be deposited with Messrs. S. G. and G. C. Ward, with instructions to deliver them to Dickinson on his making payment of the aggregate amounts due the creditors as provided, this payment to be in four equal parts at intervals of sixty days each — the entire contract being conditioned upon the ability to purchase the property named, which included all the property covered by the mortgages and certain other lands and stocks, at a gross price not exceeding $2,250,000. It is stated that there was on the same day another agreement entered into between Dickinson and the owners of the balance of the property for its purchase, but that agreement is not in evidence. Also on the same day a contract was made between Dickinson and the defendant, by which Wilson agreed to assist in perfecting the title to the property and carrying through the prior agreements, and which, contemplating that by the use of bonds and receiver's certificates the entire purchase might be made at a sum less than that named, $2,250,000, stipulated that whatever of surplus there might be should be paid over to Wilson. The negotiations for the purchase by the English syndicate were continued from time to time, but for reasons not disclosed the matter was never consummated. On February 27, 1877, another agreement was prepared for execution by the creditors aforesaid and Don M. Dickinson which, referring to the prior agreements and also to the fact of a decree having been entered, stipulated that the securities belonging to the creditors should be placed under the control of Albon P. Man, of New York, and the defendant, as trustees; that such trustees should attend the foreclosure sale or sales, and, to the extent of the means furnished them for that purpose, bid in the property; that the title being vested in them, they should organize a new corporation with a capital stock of $8,000,000, to which corporation they should convey the property they had purchased; that the corporation should, besides issuing the $8,000,000 of stock, also issue bonds to the amount of $4,000,000, properly secured by deed of trust, which stock and bonds and deed of trust should be deposited with Drexel, Morgan & Co., with

directions to deliver all to Don M. Dickinson, or such person or persons as he should designate, on his or their depositing on or before the first day of June, 1877, to the credit of the said trustees, the sum of $1,886,251.40, which moneys the trustees were to dispose of, first, in paying the expenses of the sale, purchase, reconveyance, and issue of certificates of stock and bonds and the formation of the corporation; second, in the payment of any moneys that should be furnished them for the purpose of enabling them to perfect the title to said property; third, in the payment of the sums due to the creditors under the agreement of September 24, 1875, amounting to the sum of $1,296,103.41. The fourth stipulation in reference to the disposition of the money was as follows:

"Any balance remaining in the hands of said trustees shall be delivered to Nathaniel Wilson, and his receipt therefor shall be a full discharge to the said Albon P. Man, of all liability therefor, and the said Nathaniel Wilson shall not be liable to account to the parties hereto, or any of them, in respect to the moneys so paid to him as aforesaid, and upon the payment of said moneys to said Wilson the terms and conditions of the trust hereby created shall be considered satisfied."

It was further provided that in case the sum named was not paid on or before June 1, 1877, Drexel, Morgan & Co. should redeliver to the trustees the stocks, bonds, and securities deposited with them by the trustees, and that thereupon the said trustees should transfer and deliver to Dickinson, or to such person or persons as he should direct, in writing, one full tenth part of the stock and bonds, and to the creditors, in such manner as they might in writing appoint and direct, all the residue and remainder of said stock and bonds. That agreement was signed by Man and Wilson, who accepted the trust created by the instrument, and agreed to perform its duties, and also by Dickinson, J. Boorman Johnston & Co., and Theodore M. Davis as receiver, but not by the Ayers. It was, therefore, not a fully executed agreement. It is significant, however, as expressive of the intent of the parties signing, and as showing the relations of Wilson to the transaction. But on April 9, 1877, two contracts were entered into, executed by

all the creditors above named, together with Albert G. Cook, also a creditor, as well as by Dickinson, Man, and Wilson, the first of which contained provisions for the disposition of the moneys in case Dickinson should make the payment to Drexel, Morgan & Co., similar to those found in the contract of February 27, the stipulation as to the payment to Wilson being in these words:

"Fourth. The balance, if any, remaining after the payments aforesaid shall be paid to and retained by said Nathaniel Wilson, his personal representatives or assigns, discharged from this trust, and shall be held, used, and disposed of by him or them without accountability therefor to the parties aforesaid or any of them by reason of anything herein."

The other provided that if Dickinson should not make the payment at the time specified, the trustees should take the bonds and stock, cancel all the former, and issue to Dickinson one-tenth of the shares, and then, after a sale of a. portion, should distribute the balance as follows: To the creditors, respectively, in the proportion which the sums of money they would have received, in case the English sale had been consummated, bear to $1,693,311.74, and to Wilson as follows:

"To the said Nathaniel Wilson, his personal representatives or assigns, the same proportion of said shares remaining as aforesaid which the sum of three hundred and ninety-five thousand dollars is of one million six hundred and ninety-three thousand three hundred and eleven dollars and seventy-four cents ($1,693,311.74)."

The agreement contained also this stipulation:

"And the said Wilson, in consideration of the interests secured to him by the said indenture and this agreement, doth hereby agree unto and with the said parties of the first part, and each of them, that, in the event of the purchase of said property by said trustees, (Man and Wilson,) or the survivor of them, he will indemnify said parties of the first part, and each of them, against, and will pay all the charges and expenses of said trustees (Man and Wilson) and their said associates, for and in and about the execution of their said trusts; all lawful charges of the trustees under the mortgages in fore-

closure whereof said property shall be sold; the taxable costs in the suits and proceedings for foreclosure of said mortgages; the charges of the master or masters in chancery, or other officers, in or for the sale of said property; all claims or demands of Alfred Russell remaining unpaid for services and expenses in said suits or proceedings, and for any portion or interest in said property or any shares in the capital stock of said proposed corporation."

The sale of the property was duly made on May 11, 1877. It was bid in by Man and Wilson; the corporation provided for was duly organized under the name and style of the Lake Superior Ship Canal, Railway and Iron Company; the English capitalists failed to make the purchase, and thereupon the stock was distributed to the various parties as named in the last agreement of April 9, 1877.

At the time the decree was prepared and submitted to the court for approval and signature, the circuit judge inquired whether provision had been made for the compensation of the assignees and their counsel, and was told that satisfactory arrangements had been made therefor. The arrangements which had been made were these: Dickinson represented to Meddaugh & Driggs the negotiations which were pending with the English syndicate, and which he was sanguine would be successful, and the fees of the assignees in bankruptcy having been fixed at $13,000, the claim for which was subsequently transferred to plaintiffs, and of their counsel at $25,000, Dickinson agreed to pay those sums out of the moneys which he should receive from the English syndicate, when and if the sale was carried through. And this was the agreement which was pronounced by the plaintiffs to be satisfactory. On February 13, the day after the signing of the decree, he wrote to Meddaugh this letter:

"DETROIT, MICH., *February* 13, 1877.

"E. W. Meddaugh, Esq., Detroit.

"DEAR SIR: I attended a session of the referee's court last night and also this morning from 9 to 12 o'clock, so that I have had no time before to write you on the ship-canal matter.

"I am so entirely confident that I can make an arrangement by which, if the English negotiation now in the hands of Avery is carried out, *that* I can pay out of the $2,250,000 the fees of Meddaugh & Driggs and of the assignees that I am willing to bind myself by the following statement:

"If the English negotiation is consummated, so that the money shall be paid through it for the property and for the discharge of the syndicate indebtedness, I will pay from it to you $38,000.00 as and for fees of Meddaugh & Driggs and of Jerome and Beaman, assignees.

"Yours very truly, DON M. DICKINSON."

On March 7, Dickinson wrote to Davis this letter:

"*March* 7, 1877.

"Theo. M. Davis, Esq., 20 Nassau Street, New York.

"DEAR SIR: Please have the papers signed by Messrs. Man and Wilson and forward to me at your earliest convenience. It is of importance to all of us, as Messrs. M. & D. having learned of my return from New York, are after me for their voucher.

"I wish you would telegraph me on receipt of this when you will send it, so that I can show them the telegram.

"Yours truly, DON M. DICKINSON,
Per A."

To which Davis replied as follows:

"NEW YORK, *March* 10, 1877.

"Don M. Dickinson, Esq., Detroit, Mich.

"D'R SIR: Yours of the 7th inst. came duly to hand.

"I herewith enclose Wilson's agreement duly signed. The other agreement has been signed by Messrs. J. Boorman Johnston & Co. and myself, and will be signed by the Ayer party as soon as a guardian is appointed, its provisions having been approved by Judge Bonney.

"Said agreement has been delivered to Wm. M. Sebrey.

"Yours truly, THEO. M. DAVIS."

The only agreement signed by Wilson in which Meddaugh & Driggs' names appear is the following :

" Referring to the extension agreement of the ' Dickinson contract ' this day signed, and under which Albon P. Man and myself are appointed trustees, it is provided therein that certain moneys shall be paid to me for which I shall not be held accountable by any party to said agreement, and in case of the success of what is known as the English negotiations referred to in said agreement and of the consequent payment of the money thereunder as contemplated thereby, in consideration that said Don M. Dickinson has or does agree to pay to Messrs. Meddaugh & Driggs, att'ys of Detroit, as and for cash and expenses (by them and their clients incurred and expenses) amounting to thirty-eight thousand dollars, I do agree to and with said Dickinson to pay to him for said Meddaugh & Driggs that sum out of said money so to be received by me as aforesaid.

" Dated February 27, 1877.

"NATHANIEL WILSON."

*Mr. Otto Kirchner* and *Mr. George F. Edmunds* for appellants.

*Mr. H. H. Wells* and *Mr. J. P. Whittemore* filed briefs for same.

*Mr. W. D. Davidge* and *Mr. John E. Parsons* for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The argument in support of the conclusion reached below is a simple one; and may be briefly stated thus : The only promise made by the defendant looking to a payment to Meddaugh & Driggs was conditioned on a sale to the English syndicate ; that failed, and, therefore, the promise failed. The promise made by him in the second of the two agree-

ments of April 9, 1877, — that agreement under which the matter was finally disposed of, — specified certain payments, but among them was none to the plaintiffs. In other words, he received the stock transferred to him burdened with certain express trusts; the plaintiffs were not named as beneficiaries therein, and, therefore, they can claim nothing by virtue of any express promise. In the foreclosure suits their services were antagonistic to the interests of the mortgage creditors, the parties to the agreements with Wilson. Nothing was charged against the property in their behalf in those suits. The mortgagees were under no obligations to them, because in that litigation they represented adverse interests. Thus, neither by express decree nor upon any principle of equity was the property, when purchased for the benefit of the mortgagees, burdened with a charge in their favor. Hence, not only was Wilson under no express promise to or for them upon which an action at law would lie, but also he received the stock free from any express or implied burdens in their favor. There was no trust attached to the property which they could enforce.

While this reasoning is direct and clear, there are considerations many and persuasive which show that equity will not be satisfied, nor will justice be done, unless and until the plaintiffs are admitted to a share in the stock transferred to the defendants. And first must be considered the situation of the parties at the time the decree was entered. The mortgagor had been thrown into bankruptcy, and Beaman and Jerome appointed as assignees. As such assignees they represented not merely the mortgage creditors, but all the creditors and all the stockholders in the company. It was no single interest which was committed to their care, but it was their duty as assignees to look after the interests of all having claims upon the property. Acting in good faith, as it must be supposed that they did, they conceived it their duty to defend the foreclosure suits and to file a cross-bill looking to the administration of the entire assets of the corporation. Their services in this respect not being to any party or parties but in respect to the property itself, and to

secure its proper application among all parties interested, it is clearly in accordance with settled rules of equity jurisprudence, as well as with the practice in bankruptcy proceedings, that compensation for their services, including the pay of their counsel, should be made a direct charge upon the property, and a charge prior in right to the claims of creditors or stockholders. " It is a general principle that a trust estate must bear the expenses of its administration." *Trustees* v. *Greenough*, 105 U. S. 527, 532. It is true that ordinarily the assignees in bankruptcy have possession of the property, and such possession adds to their cares as well as to their compensation. In this case they did not have possession, the property being already in the custody of the court through its receiver. But the lack of possession did not relieve them from all duty, nor destroy their right to compensation. The duty of looking out for the interests of all was as pronounced as though they had the actual possession, and the lack of possession was only to be considered in determining the amount of compensation.

It was in this situation of things that a decree was entered for the foreclosure and sale of the properties without any express provision for their compensation. This decree was entered in pursuance of negotiations which had been for some time pending between the creditors and the representative of the corporation and its stockholders, in which the amount that the creditors would take in cash was agreed upon, and out of the difference between that sum and the amount which such representative was hoping to obtain from a proposed purchaser were to be paid all the expenses of the litigation. The representative was sanguine of the success of his proposed sale. The plaintiffs were doubtless affected with his confidence, and so accepted his promise to pay their compensation out of the moneys received from that purchaser, and waived any incorporation of an express provision therefor into the terms of the decree. But while, as it seems, they were unduly sanguine, is it for a moment to be supposed that they were intending to donate their services in case the proposed sale should not be accomplished, or that the

creditors or defendant understood that they so intended?
The question carries its own answer. The case is not such
as would arise if these plaintiffs had accepted an absolute
promise from Dickinson or defendant in lieu of a charge upon
the property provided in the decree. If, for instance, either
had promised them absolutely to pay the $38,000, it might
have been argued that they wholly waived any right to look
to the property; were willing that provision for a charge
thereon should be omitted from the decree, and were content
to take the responsibility of such promisor. But here the
promise was only a conditional one, that, if a proposed sale
was accomplished, out of its proceeds payment should be
made. Evidently, confidence in the accomplishment of the
proposed sale was so great that it was deemed unnecessary
to provide for the contingency of its failure. But the unex-
pected did happen. The sale failed. But their equitable
right to have their charges paid out of the proceeds of the
property did not cease. They would have been entitled at
any time before the final consummation of the foreclosure
proceedings to have had the decree modified, or an order
entered making their fees a charge upon the property.
These mortgage creditors and the defendant knew of the
existence of the claims of the plaintiffs, and the amount
thereof, and must as a matter of law be presumed to have
known that they were properly charges against the property,
and could, if need be, by express order be made a prior lien
thereon. In this situation the trustees named in the creditors'
agreement, one of whom was the defendant, become the pur-
chasers of the property. They purchase it at the master's
sale, knowing that these charges of plaintiffs, rightfully
existing against the property, were only conditionally provided
for. If the condition happened, and the contemplated sale
to the English syndicate was made, then defendant, out of
the moneys that would come into his hands, would pay their
charges. This he had expressly covenanted to do. If the
property was bought and the condition never happened, can
it be that he took the property free in equity from the burden
of such charges?

Suppose that the case was relieved from the embarrassment of conflicting testimony, and that the facts as claimed by the defendant were free from dispute. The decree was entered without any provision for the payment of fees of the assignees or their counsel, such omission being upon the conditional promise of Dickinson and the defendant. Suppose that thereafter, and before the sale under the decree, the creditors, the defendant, and Dickinson, finding that the negotiations with the English syndicate were going to fail, agreed and determined to say nothing to the plaintiffs about such failure, to let the decree stand without any provision for their compensation, to purchase the property in the same way that purchase had theretofore been contemplated, and then to divide it among themselves without making any provision for the plaintiffs, and that all this was carried into effect, the plaintiffs being ignorant of the changed condition of affairs and the altered purposes until after the stock had been distributed — can it be said that under such circumstances equity would be powerless to interfere, that if the plaintiffs were willing to trust the matter of their compensation to the conditional promise, the parties who made it and the parties interested in the property could, upon the failure of that condition, ignore their claims for compensation and secure a title to the property discharged of all liability to them? If that be so, it would seem that equity lies under the imputation of sometimes preferring the form to the substance of things. Suppose that the second of the agreements of April 9 had never been signed, and that the creditors (sharing in the confidence apparently possessed by Dickinson and the plaintiffs in the successful carrying through of the pending negotiations) had stipulated for the purchase of this property by Man and Wilson, and the disposition of it only through the means of the proposed sale to the English syndicate, and that, thereafter, such proposed sale had failed of accomplishment, can it be doubted that Man and Wilson would hold the title in trust for their benefit, and for each of them according to his proportionate interest? Could they say, we took this property with an express promise to dispose of it in a certain way, and because that way has

failed we hold it discharged of all liability? Is the rule any different when these plaintiffs who had a claim of equal equity against the property, come into court, and say that the condition expressly provided for has failed? Have they not the same right to be recognized and paid out of the property? It is a cardinal rule of equity that it assumes that that is done which ought to be done; that it looks rather at the substance of rights than at the forms of proceedings. Unquestionably when Man and Wilson, the trustees, purchased at the master's sale — the time for the completion of the proposed sale to the English syndicate not having then expired — they took the property burdened with an implied obligation to the plaintiffs. It was to be satisfied by the payment of money if the contemplated sale was carried through. This promise of Dickinson and the defendant to the plaintiffs was not a donation, a mere gratuity, something done out of the abundant kindliness of their hearts, but it was in discharge of an obligation equitably resting upon the property, and to relieve it from the burden thereof.

This is not the case of a stranger making a purchase, who might be justified in relying on what appeared upon the face of the record, and upon a purchase take the property free from all liabilities. For here the decree of the court, and the sale in pursuance thereof, were but steps in the schemes originated by the creditors with Dickinson and the defendant for the purpose of securing to themselves an absolute title, and one free from burdens.

But what was really the understanding and intent of the parties, and especially of the defendant? This is his testimony:

"Mr. Dickinson said to me that it might be necessary in order to effect a sale to pay some money to Meddaugh & Driggs, the attorneys for the assignees in bankruptcy, and to the assignees in bankruptcy, for their fees and expenses, which had been considerable, so that he might have to provide for them for the expenses and costs. Whether anything was said about fees as fees I do not recollect. He said if the money came into my hands, as it was anticipated it might, I could

very well afford to pay him whatever he had to pay them. I at first objected, and something was said concerning the amount which he would have to pay, and concerning the amount of their costs and expenses, and finally the sum of $38,000 was mentioned as being the amount of the costs and expenses of all the parties, the assignees, and the attorneys of the assignees, which was as much as he expected in any event to be called upon to pay, and immediately afterwards the same representations and statements were made by Mr. Theodore M. Davis in the same room, and, I think, at the same time. It was in New York; and then I said that I would agree, if the English negotiations went through and the money secured by the agreement was paid to me, that out of that money I would pay to him whatever he had agreed or should agree, or might have to pay to Meddaugh & Driggs and the assignees in bankruptcy for expenses and costs to the extent of $38,000. I do not recollect that anything was said about fees."

This shows that the defendant, at the commencement, understood that $38,000 was part of the costs and expenses of the litigation then pending.

The description of the claim as costs and expenses and not as fees is significant. It interprets the meaning of Wilson's express stipulation in the second of the two contracts of April 9, 1877, for he stipulates to pay "the taxable costs in the suits and proceedings for foreclosure of said mortgages;" not the taxed, but the taxable costs. Strictly speaking, that which is allowed to trustees and counsel, as compensation for their services, is not a part of the taxable costs, and, ordinarily, those sums which they pay out for their personal expenses and other costs of the trial are included with their compensation in a gross allowance. And yet the money which they pay out for such costs and expenses may, if separately stated and charged, be not inaptly called part of the taxable costs. If this were the only matter throwing light upon the understanding of the parties, it might be said that this was a mere refinement as to the meaning of words, but immediately following the stipulation referred to is this language: " Neither of said parties of the first or second parts shall by reason of any-

thing herein be personally liable for or on account of any moneys procured, advanced, or used by said trustees in the purchase of said property, nor for any expenses or charges in or for the execution of the trust herein created."

The trust herein created, as shown by the previous language of the agreement, and that made contemporaneously with it, was the purchase by the trustees, Man and Wilson, of all the property, the securing of a perfect title, the creation of a corporation, the conveyance to it of the property thus purchased, and the distribution of the stock, or, as the duty was expressed in the agreement —

"First. To the payment of the expenses and charges of said sale and purchase of said property, the establishment of said corporation, and the execution by said Man and Wilson and their said associates of the trusts hereby created.

"Second. To the repayment of any moneys by said trustees procured or advanced and used in the purchase of and payment for said property to the extent authorized and limited by said agreement of even date herewith."

"To the payment of the expenses and charges of said sale and purchase of said property." This means, of course, all the expenses and charges. All the express liens had passed into the foreclosure decree, and had been provided for in the agreement by specific appropriations of stock; and the scope of the general language here used was obviously to cast upon Man and Wilson, as trustees, the duty and the burden of removing every charge or incumbrance which in law or in equity could, as a consequence of the legal proceedings, rest upon the property. Such duty and burden passed, by the clear language of the agreement, from Man and Wilson to Wilson, as the recipient of the residuum of the stock.

The parties of the first and second part were respectively the creditors named, and Dickinson. Upon them, by the provision above quoted, none of the expenses or charges of the execution of the trust were to fall. Necessarily it follows that whatever had to be paid was to be paid by Wilson, and out of the stock which was coming to him as his portion. Nor is this strange. The sums which the creditors were to receive, whether

in cash or in stock, by one or the other of the agreements, were for securities of the old corporation, whose form and amount were specified, and which were to be surrendered by them to the trustees, Man and Wilson. In other words, they agreed to receive a certain specified sum for the securities which they turned in, and the figuring as to the amount was, in most cases, carried to the very cent. While the consideration for the one-tenth transferred to Dickinson is not in terms expressed on the face of these contracts, it clearly appears from the testimony that it was the services rendered by him in bringing the litigation to a close, the equity of redemption belonging to the mortgagor corporation, and the satisfaction of claims in behalf of some of the stockholders. As for Wilson, there was no specific statement in detail as to items and amounts of all the consideration for the money or stock to be paid to him. Evidently the odds and ends of closing out this transaction were to be thrown upon him. Dickinson and the creditors were to have so much stock absolutely; he was to take the remainder, pay out of it or its proceeds all that had to be paid, to perfect the title and remove all charges and incumbrances upon the property, and the balance was compensation for his services and risk. So the stipulation was that Dickinson and the creditors should be liable for nothing, and as the scheme involved the entire settlement of the affairs of the corporation, it follows that Wilson was the party upon whom the residuary burden was cast. It is not strange, therefore, that the witnesses, speaking from memory as to what took place in the various negotiations, do not agree as to the items composing this residuum. It is not to be wondered that all the items were not named, or the amounts fixed, and, hence, naturally arises some contradiction in the testimony as to what was said and understood between the parties. The parties all looked to the defendant as the one to relieve them of all liability. He was, as may be said, the residuary legatee of all the burdens and expenses.

With reference to the obligation assumed by him in case the sale to the English syndicate was carried through, when asked what was to become of the balance that would remain

in his hands after paying the creditors, and whether it was intended as a gift or otherwise, he testified:

"Out of that balance, whatever it was, I was to pay for receiver's certificates, for bonds, for trustees' commissions. I was to pay counsel fees to Alfred Russell, whatever they might be, and I was to pay $38,000 under and in pursuance of the agreement I had made with Dickinson of February 27, 1877, in reference to his obligation to Meddaugh & Driggs. Whatever was left was for my own compensation."

And further, with reference to the same matter, appear these questions and answers—

"Q. In case there was a deficiency and the balance which was expected to remain applicable to that purpose should not be sufficient to pay and discharge the whole amount of all of the several claims so provided for, by whom was the remainder to be paid?

"A. By myself. That was a responsibility and risk that I assumed.

"Q. If there should turn out to be an unexpected remainder of said balance after the discharge of all of said claims, what were you to do with such balance; was it to be kept by you for your own benefit, or to whom was it to go?

"A. It was to be my own, for my own benefit."

It is admitted that the written stipulation in the last contract did not express all that he agreed to do in consideration of the stock transferred to him. Thus he testifies, referring to that contract:

"A. I have stated what my liability was under that contract, and there were things undoubtedly to be provided for not specifically mentioned in that contract. For instance, no mention is made of receiver's certificates, or of bonds, or of stock. The trustees' commissions were provided for, I think; and there was no mention of my compensation."

And again:

"A. There was no other written agreement to which I was a party, but it was understood that I was to pay or take care of certain bonds and receiver's certificates and the claims that

I have enumerated. The charges of the trustees and compensation to them were provided for in the agreement."

And when asked between whom was that understanding and when was it made, he answered :

"A. It was made before the agreement of April 9th, and was between the members of the syndicate, Mr. Davis individually, and myself."

The written promise was, therefore, by his own admission not the full measure of his obligations.

In 1880 there was a Congressional investigation, having reference mainly to the transactions of Davis, as receiver of the Ocean National Bank. On that investigation the defendant was a witness, and testified as follows :

"As against the stock still in my hands there are outstanding claims — at least one, and perhaps more — on the part of persons who claim that they were employed by the syndicate and that money is due to them, and that they are to look to me for it. One claim is made by Meddaugh & Driggs, who were counsel in the bankruptcy proceedings. They claim to be entitled to $34,000 ($38,000) for their professional services, and they have threatened to bring suit against me for it. I do not think they are entitled to that under the agreement that was made with them, but if there is any liability to them under that agreement with them which I signed, I am the person on whom it rests. It was for the purpose of providing for these contingencies that this amount was fixed in the way it was."

And again, responding to this question :

"Q. Out of that $395,000 I understand that you were to pay the expenses of litigation, and whatever money was due Mr. Russell under his agreement with those people?"

He answered, "Yes, sir."

And still again, when asked for what he received the stock, after naming some things, he said : "In addition to which was the liability that I came under to pay all the charges that any one had against this syndicate, as it has been called." Could language be used to more clearly affirm that his agreement was, as he understood it, to pay among others this claim of

plaintiffs, which, as we have seen, was equitably a charge upon the property, and of course, therefore, against the syndicate?

Another matter: In the spring of 1878, Alfred Russell, whose name appears in the stipulation signed by the defendant, not having received the payment which he expected, prepared to commence a suit against defendant. The latter was advised of this fact, and on April 1, 1878, he wrote to him a letter, containing this statement:

"My obligation, as I understand it, is to pay to you whatever stock you are entitled to under any agreement that you may have with the so-called syndicate. You and Mr. Davis do not agree as to what that agreement was. I have no knowledge of it except as I learn of it from others. One thing, I believe, is admitted, and that is if the English negotiations had gone through, of the $587,967 which was to come into my hands, $50,000 was to be paid to you in cash. The English negotiations did not go through, and no $587,967 came to me. Instead of that, the conditions of the agreement of April 9, 1877, take its place. Instead of $587,967, I am to receive $395,000, or so much of the capital stock as is the proportion between that sum and $1,600,000 — that is to say, I now have $395,000 to pay to the same persons who were to have been paid $587,967.

"Are you entitled to receive precisely the same sum or amount of stock as if I had $587,967, or should you submit to a *pro rata* reduction, just as I and every one interested in the fund will submit to? My own opinion is that you are fairly entitled to the same proportion of the $395,000 that you were to receive of the 587 M, and should unhesitatingly say that such was your just due. If you were to receive the sum which I have already mentioned, I would not hesitate, on my own responsibility and without the approval of any of the syndicate, to make a declaration of trust in your favor to the effect that you are entitled to the same proportion of the stock which I received as you were to receive under the original agreement — that is to say, your share in the whole capital stock is diminished in the rate that 587 M has to 395 M. This would be easily expressed in figures."

Herein is an express declaration, made within a year of the signing of the last agreement, that out of the stock received under that agreement he was to pay the same. persons who were to receive payment out of the moneys which he would have received under the first agreement, and an argument therefrom that, as he was to receive under the latter agreement less than under the former, the parties to receive payment should proportionately scale down the amounts they should be satisfied with.

In the bill filed by Russell was a copy of a memorandum, which he alleged had been made by Davis, the receiver of the Ocean National Bank, who was clearly, as shown by the testimony, a leading spirit in the negotiations, as follows:

| | |
|---|---:|
| "100 bonds and 10 certificates | $30,699 09⅜ |
| Int. acc't since Jan. 1, 1871, and certificates since May 8, 1874, other interests equal cost of... | 24,470 79½ |
| Int. on 50 bonds am't to prin. cost | 12,344 63⅓ |
| 20 certificates 12,136.16 call, total for both | 70,000 00 |
| Certificates par 10%, etc. | 76,000 00 |
| Bal. certificates and int., int. 10% | 63,700 00 |
| Man trustee Hubbell | 10,500 00 |
| Frost, Sutherland, Birdseye & McCarter, $5000 each | 20,000 00 |
| Over | 170,200 00 |
| Forward | 170,200 00 |
| Russell | 50,000 00 |
| Davis | 115,000 00 |
| Meddaugh & Driggs | 38,000 00 |
| Sundries, including said Wilson | 21,800 00 |
| Total | $395,000 00 " |

On August 2, 1878, the defendant wrote this letter:

" My Dear Mr. Russell:

" In the memorandum referred to in your bill a sum appears which is to be paid to Meddaugh & Driggs, and which makes up in part the 395 M which was to have been paid to me. I

have rec'd and now enclose a copy obtained from Mr. Dickinson of· my agreement with Meddaugh & D., from which you will see that I was to· pay them only in the event of the success·of the English negotiations and the payment to me of· the cash. I send you this to show that the mem. could not have been intended to definitely fix the disposition of the stock that was to be issued to me. If that mem. is conclusive then M. & D. have a right to a portion of the stock which I hold, and ,that liability I can never admit, because I never assumed it. I am willing to pay and to act upon the assertion of your right to so much of the stock in my hands as I designated in a former letter. Have you anything to offer or suggest as to a method of settlement? Will you state (abate) anything of your first demand? I am very anxious that you should have your stock without any delay. Delay may be injurious to both.  .  .  . Write to me at your convenience. Let us make an effort at adjustment before it is too late."

Do not these letters tend to show that the claim now made that plaintiffs were not to be compensated out of the stock transferred under the last agreement to defendant was an afterthought, springing from the fact that the defendant had noticed, or had his attention called to, the omission of their names in the stipulation in that agreement? How easily the defendant would be led to such a conclusion! His obligation was expressly to the creditor's syndicate (so called) and Dickinson. His promise was to save them harmless. Whatever debt rested against the property, or could be made a personal obligation of theirs, growing out of the transaction, he was to discharge. The less he· had to pay in this direction the larger were his own profits. At first he recognized his liability to the plaintiffs, spoke of it in the way that might be expected as one of· the things that he had to take care of, but discovering himself, or having his attention called to the omission of plaintiffs' names from the stipulation, he proceeded to insist upon his non-liability for their claim.

Another matter throws light upon this. It appears that the corporation as finally organized had stock of $4,000,000 —

40,000 shares of $100 each. The number of shares transferred to the defendant was 8387 shares. Of these he issued and transferred in satisfaction of various claims which he recognized, including those to Russell, 4640 shares, leaving in his hands 3747 shares, in respect to which he testifies: "The remainder of the stock was owned by me, and I have issued no other shares, except temporarily for use in borrowing money in my own private transactions."

For what was this balance of stock given to Wilson? It must be remembered that these creditors were not claiming any general amounts; they figured to a cent the sums which each except the Ocean National Bank was to receive. Each, evidently, was anxious to secure for himself as much as possible. Negotiations were carried on for months — even into years. All the liabilities, conceded and doubtful, must have been known to them. Davis, the receiver, testifies "we knew how many bonds and receiver's certificates Mr. Wilson had and represented." It is not to be supposed that they would throw away anything, or make generous donations to any one. While of course it was reasonable, and to be expected, that they would leave for the defendant, who assumed the general residuary liability, a margin above all obligations actually known, in order to compensate him for the risk as well as to pay him for his services, it is not to be supposed that they were so ignorant of the situation, so misunderstood the real obligations growing out of their negotiations and foreclosure proceedings and all the litigation, as to give to him stock amounting, according to the value then placed upon it, to the sum of $175,000 and over. Evidently they understood, and he understood, that that surplus stock represented other obligations than those he has provided for. And while he testifies to having purchased some receiver's certificates and bonds with his own money, he shows no investment in excess of a few thousand dollars. Indeed, the significance of the testimony in this respect is chiefly in its indefiniteness and omissions. As a witness in this case he testified that Mr. Girard and himself at first bought 40,000 certificates for between $25,000 and $30,000, and that the

money that the two expended and paid into the hands of the receiver for bonds amounted to between $50,000 and $60,000 in cash. In the list of persons to whom stock was issued he names Edwin Girard as receiving 1026 shares. An entry made in his memorandum book at the time the receiver's certificates were purchased shows that one-half of the cash was paid by him and one-half by Girard, and his statement of the manner in which the subsequent purchases were made indicates that such purchases were on their equal account. During the Congressional investigation, he was asked this question: "Q. I want to get at how you came into possession of 3694 shares of this valuable stock. What did you give for it?" To this he replied, "I will give you the figures as nearly as I can. I got possession of that stock by paying, in the year 1874, $25,000, and between $35,000 and $37,000." And then, after one or two intermediate questions — there appearing to have been some interruption — the question was again asked, "For what did you receive this stock," and his reply was, "I am telling you. When you interrupted me I had gone so far as to say that it cost me $37,000, and the costs of the suit were $2000 or $3000 more, in addition to which was the liability that I came under to pay all the charges that any one had against this syndicate, as it has been called."

It may be noticed that the $25,000, which he here says he paid in 1874, was, as shown by the memorandum referred to, paid by Girard and himself in equal proportions.

Again, he testifies that in fixing the amount of $395,000, $10,000 was estimated for his services and $20,000 for those of the trustees, Man and Wilson, and it appears that Man received a certificate of stock of 203 shares as compensation for his services.

He testifies that "the stock to Edwin Girard was for receiver's certificates and bonds which he and I had bought together; $40,000 receiver's certificates, $75,000 of bonds, and $10,000 of stock of the old corporation, my recollection is."

Putting this testimony together, it will be perceived that he retained 3694 shares as his own property. Girard received

1026 shares on account of their joint purchases, and it is to be presumed that on like account he was entitled to the same number. 1026 from 3694 leaves 2668 shares. If Man received 203 shares, he, as co-trustee, would be entitled to the same number, and for his subsequent services, according to his own statement of the estimate, another equal sum, or 406 shares for those two items. Subtracting that, there still remain 2262 shares for which no satisfactory explanation is given.

It is true that when asked what was included within and covered by the $395,000 in the last agreement, he testified as follows:

"A. $90,000, receiver's certificates; $40,000, trustees' commissions; $160,000, stock and bonds; $50,000 to J. Boorman Johnston and Company or Gordon Norrie on account of bonds; $25,000 or $35,000, I do not remember which, to Alfred Russell; $10,000 to defray the expenses provided for in the agreement, and $10,000 for my compensation. That must have made Russell $35,000 if these figures are right."

This shows $300,000 out of $395,000 for bonds, stocks, and certificates, but the application of the stock transferred to him shows no such proportionate disposition thereof for such purposes.

Another item of testimony is a memorandum said to have been made during the negotiations prior to the signing of the last contract, by one who was present, as follows:

"What Davis must pay out of amo. which he receives on failure of English negotiations, viz., to Sept. 1, '75:

"Probable amo. required for Girard's bonds (75 @ 43 M & int.).............. $60,000
"  "  "  " '79 certif., 2d issue, May 8, '74, & int., say..... 89,000
"  "  "  " A. P. Man's trustee bonds (Hubbell), say........ 11,500
"  "  "  " Chs. L. Frost, trustee... 25,000
"  "  "  " other trustees, Birdseye, Sutherland, & McC.'s, 5000 each .......... 15,000

Opinion of the Court.

Probable amo. required for Russell claimed ....... $25,000
   "      "      "     " Man & Wilson, trustees.   15,000
   "      "      "     " costs of court......... :..  10,000
   "      "      "     " expenses preparing bonds    4,000
   "      "      "     " wagon-road lands, 4700
                              acres ;  T. M. Davis'
                              profit ..............  140,500
                                                    ─────────
                                                    $395,000 "

The last item therein is significant, especially taken in connection with the testimony given by defendant to the effect that of the $250,000 going to the Ocean National Bank only $150,000 represented stock and bonds, and $100,000 was for compensation of the receiver, Davis.

We must not be misunderstood as imputing to the defendant a lack of truthfulness, or suggesting that his testimony was false. On the contrary, his truthfulness doubtless compelled this very omission and indefiniteness. It does not seem reasonable that a man of the business capacity shown in these transactions by the defendant would have entered into any obligation of this character without knowing exactly, or nearly so, the items and amounts which he was to become charged with, and that if in the settling up of the affairs any item failed, wholly or in part, he would be able to disclose it exactly. And the fact that the testimony is so indefinite and unsatisfactory in these respects is additional reason for believing that it was part of the understanding of the parties that the plaintiffs were to be paid out of this stock transferred to the defendant.

We have in our consideration of the case thus far endeavored to eliminate all matters of conflicting testimony, and to determine what are the fair inferences from the undisputed facts. There is, in addition to this, the direct testimony of witnesses that this claim of plaintiffs was embraced in the matters provided for by this last contract. Still, we do not care to notice in detail that testimony, for it is contradicted by witnesses apparently equally reliable, and upon that conflict-

ing testimony alone it could not be affirmed that the plaintiffs had established their case.

In conclusion on this branch of the case, we think it may be affirmed that the property was in equity chargeable with the claim of plaintiffs; that the charge was not incorporated into the decree by virtue of a reliance upon the conditional promise; that the defendant became one of the purchasers and interested in this property with full knowledge of the consideration and the equitable obligation to the plaintiffs; that the arrangement between the parties in interest and himself resulted in fixing the amounts which they should receive absolutely and under no further liability for expenses or otherwise, while he, for the considerations named, assumed all the liabilities, fixed as well as unsettled, growing out of the perfection of the title to that property; that he at one time recognized this liability to plaintiffs as one of those assumed by him in this arrangement with the creditors and others interested, and that it still remains an undischarged obligation resting upon him, and is in equity a lien upon the stock of the new corporation in his hands.

We have thus far considered only the question of the fact of liability. Upon that is the stress of the case, and to it was devoted most of the testimony, as well as of the argument. Having reached the conclusion that the defendant is under obligations to the plaintiffs, there remains the further question as to the measure of such liability. On the one hand, it may be said that the amount of the plaintiff's claim was by agreement fixed at $38,000, and that that was the sum which the defendant promised to pay in case the English negotiations were carried through. On the other hand, it is said that if those English negotiations had been carried through he was to have received $590,000 in cash, while under the arrangement as finally consummated he received stock representing only $395,000, and that, therefore, to that extent the claim of plaintiffs should be scaled down.

We have heretofore referred to the fact that the evidence is unsatisfactory as to what was intended to be included within and provided for by these two respective amounts. There is

testimony to the effect that in arriving at the latter amount those claims included in the former, which did not represent cash, such as commissions to trustees, were to be reduced, though apparently not by any uniform ratio. Russell, who had a claim for $50,000 under the first arrangement, settled at a much less figure paid in stock. It may fairly be said that the plaintiffs have not proven that their claim was to be exempted from a reduction corresponding to that made in others of like character, and of course the burden is on them to make out their case. If it be said that the amount of $38,000 was agreed upon in the first instance, a sufficient reply is that that agreement was not made with the creditors, and was only in view of the proposed sale to the English syndicate. There is no testimony as to the real value of those services. Equity would seem to say that the claim of plaintiffs should be scaled down proportionately to the amount allotted to Wilson under the two contracts, which, as we figure it, would reduce the sum to $25,440. A majority of the court are of the opinion that in view of the peculiar circumstances of the case the plaintiffs should not be allowed interest.

*The decree of the court below must, therefore, be reversed and the case remanded, with instructions to enter a decree in favor of the plaintiffs, awarding to them the sum of $25,440, and adjudging it a lien upon the stock of the Lake Superior Ship Canal, Railway and Iron Company remaining in the hands of defendant.*