TURNER, Appellant, v. WOODARD et al.

CHILD, Appellant, v. SAME.

ROSS, Plaintiff in Error, v. TURNER et al.

ROSS, Appellant, v. SAME.

In re UNITED STATES, Petitioner for Condemnation of Certain Lands in Hull.

(Circuit Court of Appeals, First Circuit. July 23, 1919.)

Nos. 1408, 1409, 1411, 1412.

1. EMINENT DOMAIN  168(2)—CONDEMNATION—PROCEEDINGS BY UNITED STATES.

Under Act Aug. 18, 1890 (Comp. St. § 6911), the Secretary of War may cause proceedings to be instituted in any court having jurisdiction of such proceedings for the acquisition by condemnation of lands in accordance with the laws relating to suits for condemnation of property of the states wherein the proceedings may be initiated, but, if the owner fixes a price which is reasonable, the Secretary may purchase forthwith.

2. EMINENT DOMAIN  243(1)—AWARD OF COMPENSATION—EFFECT.

Under Rev. Laws Mass. c. 1, § 7; chapter 48, §§ 22, 114, and chapter 111, §§ 112, 113, made applicable by Act Aug. 18, 1890 (Comp. St. § 6911), to proceedings by the United States for the condemnation of lands, the United States, or either party, may file a petition to determine by jury the value of the land to be condemned, and while the government is given an option to abandon proceedings, if it deems the valuation excessive, yet the land so valued must, if taken, unless the parties otherwise agree, be paid for at the value thus fixed, together with the payment of costs and reasonable expenses.

3. EMINENT DOMAIN  158—RIGHT TO AWARD—EQUITABLE PROCEEDINGS—WHAT CONSTITUTE.

Where all the parties interested in the fund to be derived from the condemnation of land by the United States, title to which stood in the name of a bankrupt, and which was incumbered by mortgages, agreed that the proceeds should be paid into court, which should have full power and authority to determine the respective rights and priorities of the claimants, the proceeding must be deemed an equitable one, for only equity could determine the rights of intervening creditors, mortgagees, etc.

4. COURTS  359—FEDERAL COURT—ATTORNEY'S LIEN—LOCAL LAW.

Federal courts recognize no lien of an attorney at common law beyond that given by the local law.

5. ATTORNEY AND CLIENT  175—COMPENSATION—LIEN.

Rev. Laws Mass. c. 165, § 48, giving an attorney who has prosecuted a suit to final judgment a lien thereon for the amount of his fees and disbursements, covers only attorney's fees allowed in the bill of costs, thus distinguishing attorney's fees from counsel fees.

6. COURTS  366(1)—PRECEDENTS—DECISIONS—STATE STATUTES.

The decision of the highest state court construing a state statute is binding on the federal courts.

7. ATTORNEY AND CLIENT  175—COMPENSATION—LIEN—RIGHT TO.

Attorneys for a bankrupt, who rendered services in connection with the condemnation by the United States of property, title to which stood in the bankrupt's name, both before and after bankruptcy, and whose services resulted in the obtaining of a sum considerably greater than that which the government originally offered to pay, *held* not entitled to collect for their services and disbursements on the theory of analogy to the case where one of several persons interested in trust property or a

---

 For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

259 F.—47

fund brings a suit for its preservation or administration, in which case the court will order him to be reimbursed.

8. EQUITY ☞66—MAXIM—SEEKING EQUITY.

Where all of the parties interested in the proceeds resulting from the condemnation by the United States of land, title to which stood in the name of one who before end of the proceedings became a bankrupt, agreed that on payment of the value as fixed by the jury, the court should decide the equities, *held* that, as the proceeding had to be treated as an equitable one, or the parties would be out of court, the maxim, "He who seeks equity must do equity," is applicable to all.

9. ESTOPPEL ☞79—EQUITABLE ESTOPPEL.

In a contest between various claimants of a fund arising out of condemnation by the United States of land, title to which stood in the name of one who before end of proceedings became a bankrupt, *held*, on the peculiar facts in this case, that the various parties, who signed an agreement that the money should be deposited in court and distributed, were estopped from denying the right of the attorneys for the bankrupt to recover for their disbursements and services which resulted in obtaining an increased valuation.

10. ATTORNEY AND CLIENT ☞135—COMPENSATION.

Attorneys for a bankrupt, who rendered services in connection with the condemnation by the United States of property standing in the name of the bankrupt, which property, however, was incumbered, and to which other creditors asserted claims, *held*, on the peculiar facts in this case, entitled to compensation for their services; the attorneys and all parties having agreed that the government should receive the property on payment of the value as fixed by the jury without payment of costs and disbursements, payment of which the attorneys might have insisted upon under Rev. Laws Mass. c. 1, § 7, which was made applicable by Act Aug. 18, 1890 (Comp. St. § 6911).

11. PAYMENT ☞39(6)—APPLICATION—RIGHT OF CREDITOR.

A creditor, holding security generally applicable to all his loans, may apply the proceeds of any of such securities primarily in payment of debts not otherwise secured.

12. PAYMENT ☞39(4)—APPLICATION—RIGHT OF CREDITOR.

An unsecured creditor of one C. agreed to make a further loan to be secured by a note executed by the bankrupt as well as by the deposit as collateral of mining stock, the offer of C. providing that the security should be applicable to other indebtedness; after the bankrupt had applied the dividends from the mining stock to C.'s previous unsecured indebtedness, and the bankrupt executed a mortgage to secure its note, then overdue, *held*, that the application of the dividends was within the power of the creditor, and other creditors of the bankrupt were not entitled to assert that dividends should have been treated as having discharged the bankrupt's note.

Appeals from and in Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

In the matter of the petition of the United States for condemnation of certain lands in the township of Hull, title to which was in Benjamin P. Cheney, who became a bankrupt prior to the acquisition of the lands by the government. Samuel Ross intervened, as did William D. Turner and Samuel M. Child, asserting rights in the funds paid into court by the United States, which were contested by Henry Woodard and others, who also intervened. From decrees denying their claims, Turner and Child appeal, and Ross appeals and brings error. Decrees reversed in each case, and remanded for further proceedings.

William D. Turner, of Boston, Mass. (Hale & Dickerman, of Boston, Mass., on the brief), for appellants Turner and Child and for Allan Forbes, trustee.

Robert G. Dodge, of Boston, Mass. (Harold S. Davis, of Boston, Mass., on the brief), for plaintiff in error and appellee Ross.

Robert Cushman, of Boston, Mass. (Charles D. Woodberry, of Boston, Mass., on the brief), for appellee Woodard.

John P. Wright, of Boston, Mass. (Tyler, Tucker, Eames & Wright, of Boston, Mass., on the brief), for respondent J. R. Whipple Co.

Before BINGHAM, ANDERSON, and JOHNSON, Circuit Judges.

ANDERSON, Circuit Judge. The entitling alone is enough to show that this is an extraordinary record to present to an appellate court. In earlier times, when technical rules of procedure were more strictly insisted upon, no appellate court would, on such a record, have considered the issues involved. This record is objectionable, not merely in form, but on some of the questions calling for determination the disclosure of facts is scant and most unsatisfactory. We have hesitated whether the case should not be remanded to the District Court for further hearing, or dismissed entirely on the ground that only on independent equity proceedings can the questions raised be properly heard and determined.

But after careful and laborious consideration we have reached conclusions which we think just and not inconsistent with established rules of law. Our action in dealing with this case on this highly unsatisfactory record is not to be taken as a precedent.

Nos. 1408, 1409, and 1412 are appeals from orders of the District Court denying the appellants' right to share in a fund of $46,500 paid pursuant to stipulation of various claimants into the registry of the District Court by the United States under a decree of condemnation of Calf Island and Little Calf Island, situated in the township of Hull, record title to which at the time of the initial proceedings by the United States stood in the name of Benjamin P. Cheney, now a bankrupt.

No. 1411 is an alternate proceeding by Ross, seeking to raise by writ of error the same questions involved in his appeal. Ross' claim is that he was one of two second mortgagees of the premises. His claim was denied on the ground that his mortgage note of $15,000, dated March 25, 1913, had been paid by the application of the proceeds of other security held by him.

Child's claim is for $2,500 counsel fees and $931.77 for expenses incurred in connection with the trial of the case. Turner's claim is for $2,500 counsel fees and $450 expenses incurred in like manner. Child and Turner both appeared originally as counsel for Benjamin P. Cheney, adjudged a bankrupt on January 14, 1918.

The proceedings began by a petition filed by the United States on May 8, 1917, alleging that these two islands in Boston Harbor were needed for fortification purposes. The petition is entitled a "Petition for Condemnation," but this is really a misnomer. The statutes under

which the United States was then compelled in this district to proceed in order to obtain title to lands needed for war purposes were complicated and peculiar. A new and much needed statute was enacted on July 2, 1917 (40 Stat. 241, c. 35). See U. S. Comp. St. 1918, § 6911a.

[1, 2] The petition was filed under Act Aug. 18, 1890, c. 797, 26 Stat. 316, Compiled Stat. Ann. 1916, § 6911. This statute provides in effect that the Secretary of War may cause proceedings to be instituted in any court having jurisdiction of such proceedings for the acquiring by condemnation of lands, etc., such proceedings to be instituted in accordance with the laws relating to suits for the condemnation of property of the states wherein the proceedings may be initiated, with the proviso that if the owner fixes a price which is reasonable the Secretary may purchase without further delay. United States v. Certain Lands in New Castle (C. C.) 165 Fed. 783; Nahant v. United States, 136 Fed. 273, 70 C. C. A. 641, 69 L. R. A. 723; United States v. Nahant, 153 Fed. 520, 82 C. C. A. 470.

The statutes of Massachusetts thus made applicable are Revised Laws, c. 1, § 7, which, by reference, incorporates chapter 48, §§ 22 and 114, and also by reference chapter 111, §§ 112, 113. Revised Laws, c. 1, § 7, provides in substance that, failing agreement between the United States and the owner of lands desired for federal public purposes, either party may file a petition for valuation thereof; such petition must contain a description of the premises; the court, after notice to all parties in interest, is to determine by a jury the value of the estate; if there are claimants other than owners of the fee, the value of their interest is to be ascertained and apportioned as provided in Revised Laws, c. 48, § 22. "If the value so determined, with costs and reasonable expenses to be taxed by the court, is, within one month after final judgment, paid or tendered to said owners, or persons interested, * * * the fee of said estate shall thereupon vest in the United States."

Revised Laws, c. 48, § 22, provides that the jury shall find the total amount of damage and apportion the same among the several parties found entitled thereto in proportion to their several interests and to the damages sustained by them. This provision applies to the case of leaseholds or other rights ousted by the assertion of paramount government power.

Section 114 of said chapter 48 provides for the case of mortgaged land taken for public uses, and by reference to Revised Laws, c. 111, § 113, provides for the entry of a separate judgment for each mortgagee, who holds such judgment in trust to satisfy his debt and to pay over any balance to any other person entitled thereto. While section 20 of chapter 48 provides that any party who has an estate in property so taken may have his damages assessed, we find nowhere any provision in which the rights in land or in its proceeds of an attaching creditor can be determined by a jury. The right of an attaching creditor whose claim has not been reduced to judgment is not an "estate" within the meaning of these statutes.

Trial by a jury under these complicated statutory provisions results, not in a real condemnation of the land by the action of the United

States, but only in fixing a value or price which, if paid or tendered by the government within one month, results in vesting the fee in the United States. The government is not obliged to pay the amount of such final judgment and to take title to the land thus valued. If it deems the valuation thus fixed excessive, or for any other reason does not desire to acquire title on the terms thus fixed, the whole proceeding may be abandoned.

But land so valued must, if taken, unless the parties otherwise agree, be paid for at the value thus fixed. The statute contemplates the payment of costs and reasonable expenses, but there is no provision for interest accruing between the date of the petition and the time of the payment of the money, though the land must be valued as of the date of filing the petition. Burt v. Merchants' Ins. Co., 115 Mass. 1. While the owner retains possession until payment, the pendency of such proceedings obviously makes his property unsalable to a would-be user; the owner may use such property; practically he cannot sell it. Cf. U. S. v. Nahant, 153 Fed. 520, 525, 82 C. C. A. 470. Obviously, this legal machinery is cumbersome, awkward, and fraught with needless complications and pitfalls.

The petition in this case alleged that the government of the United States was informed that Benjamin P. Cheney was interested in fee in the lands described, "but the nature and extent of his interest are to the said United States unknown"; that there was outstanding a first mortgage running to Olney et al., trustees (as to which no controversy is now involved), and a second mortgage dated July 29, 1914, from Cheney to Henry F. Woodard and Samuel Ross. The prayers were for a notice to all persons claiming any right in the lands, for a valuation by a jury, and that verdict being accepted and payment being made within one month thereafter, fee of said lands might thereupon vest in the United States.

The first mortgagees promptly intervened. Cheney appeared by the appellants Turner and Child. On July 24, 1917, Woodard and Ross filed a petition to intervene, setting out that they held a mortgage dated July 29, 1914, to secure two notes each of $15,000, one dated March 5, 1913, and the other November 10, 1913, both of which were alleged to remain wholly due and unpaid.

The respondent J. R. Whipple Company, on July 24, 1917, filed a petition for leave to intervene, alleging that on October 15, 1915, Cheney was indebted to it for $18,333.05, for which it had brought suit in the superior court for Suffolk county, and had attached all Cheney's real estate, including the premises in question; that the attachment was not discharged, and that Cheney still owed the petitioner $16,333.05. The petitioner therefore alleged it had an interest in the land sought to be condemned, and prayed to be admitted as a party respondent in said condemnation proceedings.

The town of Hull, claiming unpaid taxes, also petitioned to be allowed to intervene and have its damages assessed by the jury. No question arises on this record out of this petition.

When the cause came on for trial a discussion immediately arose as to the admission of the second mortgagees, represented by Mr. Wood-

ard, one of the second mortgagees and a practicing attorney in Washington, D. C., who appeared in person. Both he and the representative of the J. R. Whipple Company, the attaching creditor, were zealous to assert their alleged rights in the proceeds of the expected taking by the government. The fact that the property was incumbered by first and second mortgages and by an attachment for over $18,000 then nearly two years old, and that the representatives of these various alleged creditors were alert to assert their claims, indicated that Cheney was insolvent and so regarded, and had only a remote and improbable interest in the proceeds. In fact he was adjudicated a bankrupt about six months later. It follows that Child and Turner really acted throughout for the benefit of all parties ultimately interested in the fund. They were at no time acting solely in Cheney's interest. Their claim is, in this important particular, distinguishable from the claim of Talbot dealt with in Gregory v. Pike, 67 Fed. 837, 843, 15 C. C. A. 33.

Turner and Child insisted that the provisions of the Massachusetts statute for admitting mortgagees were not applicable in these proceedings by the United States because, under this special statute, the assessment comes before any taking; that there might never be any taking; that mortgagees and attaching creditors could assert their rights only if there was a fund in court; and that there might never be any fund in court.

Woodard, in behalf of himself and Ross, insisted that they should be admitted as parties in order that they might not lose their rights permanently. After discussion, the court ruled that the trial of the case should be left to counsel representing Cheney, so that there would be no confusion at the trial. This ruling was expressly based upon the court's understanding that "Mr. Woodard is perfectly content to do that."

Although the second mortgagees and the attaching creditor were, through their representatives, insistent upon their rights in the contingent fund, it is worth noting that none of them offered to take or share the burden and expense of the trial. They claimed that the prospective fund belonged to the creditors of Cheney, and not to Cheney; but they were quite content to allow Turner and Child to assume the burden and expense of the valuation, which was a condition precedent to the existence of any fund in which any of the parties in interest or alleged interest might share.

[3] The parties thereupon on July 27, 1917, entered into a written stipulation as follows:

"It is hereby stipulated and agreed by all parties in interest, with the approval and consent of the court, that the only issue to be submitted to this jury shall be the value of the property in question. And by consent of all parties, if the value so determined, with costs and reasonable expenses to be taxed by the court, shall, within one month after final judgment, be paid into court, instead of paid or tendered to the parties hereto or persons interested, the fee of said property shall thereupon vest in the United States of America.

"The court shall have full power and authority, after the payment of said fund into court, to determine the respective rights and the priority thereto of all parties claiming said fund, as fully and effectively as if any and all issues respecting the same had been determined by a verdict of this jury.

"The court, without jury, shall proceed upon application of any party in interest, to hear and determine the legal and proper apportionment of said fund among the parties claimant, subject to review on matters of law, and all parties hereto agree, in open court, that upon payment into court of said fund, each shall, on request, make, execute, and deliver to the United States of America such other and further deeds or releases as may be deemed necessary to vest the title of said property in the United States of America.

"Benjamin P. Cheney.
"Henry F. Woodard.
"Samuel Ross.
"William H. Garland,
"Attorney for J. R. Whipple Company.
"Frederick E. Snow and
"Benjamin P. Cheney,
"Trustees under the Will of Benjamin P. Cheney,
"By their Attorneys,
"Gaston, Snow & Saltonstall.
"Town of Hull,
"By Its Solicitor, Thomas N. Buttimer."

To this stipulation, it will be observed, the United States is not a party. It is also obvious that if, as the result of the proceedings, such fund should be paid into court, the determination of the rights of the parties claimant, inter sese, was necessarily a proceeding in equity. Only in equity could the rights of the mortgagees and of attaching creditors be determined. Hooven, Owens & Rentschler Co. v. Featherstone's Sons, 111 Fed. 81, 87, 49 C. C. A. 229; Spring Garden Ins. Co. v. Amusement Syn. Co., 178 Fed. 519, 530, 102 C. C. A. 29; Bates v. Boston El. Ry., 187 Mass. 328, 341, 72 N. E. 1017; Wood v. Westborough, 140 Mass. 403, 5 N. E. 613; Dwight v. County Com'rs, 7 Cush. (Mass.) 533.

The trial thereupon proceeded. The government contended that the fair market value of the property was about $22,000. Witnesses produced by Turner and Child claimed that it was worth from $75,000 to $100,000. The verdict of the jury was for $46,500. The appellant Child incurred and paid out of his own resources $931.77 for expert witnesses and other expenses incidental to the preparation and trial of such a cause. Turner paid $450 for expert witnesses.

Counsel agree—and the District Court expressly finds—that these expenses were reasonable and proper and inured to the benefit of all parties in interest. Cheney's insolvency obviously constrained Child and Turner to make these advances from their own funds, relying on reimbursement from the proceeds of the land. None of the other parties claimant were prepared or offered to make the requisite expenditures or render the essential professional services.

Cheney was desirous of accepting the verdict of the jury. But the government filed a motion to set the verdict aside as excessive and as against the evidence. This motion was overruled in October, 1917. The government also filed a bill of exceptions, upon which the appellants Child and Turner expended a large amount of labor.

Pending the settlement of the exceptions, Cheney was adjudicated a bankrupt on January 14, 1918. On April 16, 1918, Allan Forbes as trustee in bankruptcy intervened in the proceedings.

It is a fair inference from the record that after nearly a year's delay all the parties in interest became desirous of having the government take the Cheney property at $46,500, even without payment by the government of costs or expenses and without interest; that as the result of negotiations carried on by Turner and Child it was ascertained that the government would pay the face of the verdict, $46,-500, and nothing more. Thereupon, under date of June 18, 1918, Turner notified the court that there was no appropriation by the government available for allowance of costs and expenses, and that therefore he and Child would "rely instead upon the discretionary power which the court has, where one party has succeeded in bringing a fund into court for the benefit of other parties as well, to allow costs and compensation out of the fund."

On June 28, 1918, Turner filed his petition for leave to intervene, setting up therein the substance of the facts above referred to, and asking to be allowed the sum of $2,950.

On July 23, 1918, Child also filed a petition asking for an allowance of $2,500 counsel fees and $931.77 expenses. On the same date the court made a decree of condemnation, which recited the bringing of the petition, the appearance of the first mortgagees, of the second mortgagees, of the attaching creditor, of the town of Hull, and the stipulation that the parties agreed—

"that the only issue to be submitted to said jury should be the value of the property in question, and that if the value so determined, with costs and reasonable expenses to be taxed by the court, should within one month after final judgment be paid into court, the fee of said property should thereupon vest in the United States."

That on April 16, 1918, Allan Forbes, as trustee in bankruptcy of said Benjamin P. Cheney, filed his petition to intervene, and that thereafter Turner and Child had filed their petitions claiming allowance for counsel fees and expenses incurred, which petitions to intervene had been allowed. It was therefore decreed that on May 9, 1917, Cheney was the sole owner, subject to such rights in favor of the aforesaid claimants as might hereafter be determined by the court, such determination not to affect title of the United States to the land; that on payment into the registry of the court in one monh from date of the sum of $46,500, fee should vest in the United States.

Under date of August 7, 1918, Cheney, Cheney's trustee in bankruptcy, the first mortgagees, the second mortgagees, the attaching creditor, the town of Hull, and Child and Turner all waived right of appeal from this decree. This determined finally the right of the United States to obtain title to the land by. the payment of $46,500 only. This sum was thereupon paid into court, and title to the land vested in the United States. The case then stood for hearing before the District Court as to the distribution of this fund.

On February 7, 1919, the court made an order for the payment of $1,409.55 to the town of Hull; $13,882.05 to Snow et al., trustees of the first mortgage; $12,306.49 to Woodard, one of the second mortgagees; the balance, $18,901.91, to be paid to Cheney's trustee in

bankruptcy, subject to the rights of the attaching creditor. The claims of Ross, Turner, and Child were disallowed. Ross' claim was disallowed on the ground that his $15,000 Cheney note had been paid by the application of part of the proceeds of Argonaut mining stock. Turner's and Child's claims were disallowed on the ground that the court, sitting as a substitute for a jury, had no equitable powers, and that therefore, although the court believed the claims to be reasonable and proper, it had no power to allow them out of the money in the clerk's hands. Hull and the first mortgagees have by agreement been paid, Woodard has not been paid, nor has the balance of $18,901.91 been paid into the bankruptcy court.

From this order of distribution Child and Turner appealed. Their assignments of error are each as follows:

"(1) The court erred in ruling that it had no power to recognize and enforce the equitable lien of the petitioner, and that its function was limited in the same way that a jury would have been limited, if no fund in court had been created by the efforts of the petitioner, with the agreement of the parties.

"(2) The court erred in ruling that notwithstanding the petitioner has a lien upon the fund in court, and that the amount of the petitioner's claim is proper, the court has no power to recognize or enforce such a lien in this case.

"(3) The court erred in directing that the entire remainder of the fund in court, after the payment of the claims of certain claimants other than the petitioner, be paid over to the trustee in bankruptcy of B. P. Cheney, thereby ruling, in effect, that while the court may allow the petitioner's claim in the bankruptcy case of B. P. Cheney, the same court has no power to allow it in this case."

Ross appealed, and also brought a writ of error. His assignments of error are that the court erred in its refusal to rule as follows:

"(1) That on the whole evidence the Ross note is covered by this security.

"(2) That the Ross note has not been paid.

"(3) That if Ross applied the dividends of the Argonaut stock to Carlisle's unsecured debts, and with knowledge of that fact Carlisle and Cheney agreed to pay the Ross note, Cheney assented to such application, and cannot now insist that the money be applied to the Cheney note.

"(4) That Cheney's agreement to pay this note on January 1, 1917, with full knowledge that Ross had applied the Argonaut dividends to Carlisle's unsecured debt, constitutes an acquiescence in such application and a modification of the agreement of June 12, 1913."

While the allowance of Woodard's claim in full is not in and of itself set up as error, yet if Child's and Turner's and Ross' claims should all be allowed, the fund would be inadequate to pay in full Woodard's claim. The appeals therefore involve the question of Woodard's share in the funds, if and in so far as the rights of the appellants, if established, may effect Woodard's interest. If Ross' claim is allowed, with interest from the date of the loan, no balance will remain subject to the claim of the J. R. Whipple Company. Under such conditions the real question is whether Child and Turner have claims in the fund superior to those of Woodard and Ross.

[4, 5] Was the fund paid into court subject to an attorney's lien to cover the proper fees and disbursements of Child and Turner? Federal courts recognize no lien at common law in behalf of an attorney

beyond that given by the local law. 6 Corpus Juris, p. 766; Gregory v. Pike, 67 Fed. 837, 843, 15 C. C. A. 33. Turning to the local law, we find that Revised Laws of Massachusetts, c. 165, § 48, is as follows:

"An attorney who is lawfully possessed of an execution, or who has prosecuted a suit to final judgment in favor of his client, shall have a lien thereon for the amount of his fees and disbursements in the cause, but the provisions of this section shall not prevent the payment of the execution or judgment to the judgment creditor by a person who has no notice of the lien."

On its face, this statute would seem broad enough to cover proper counsel fees and not merely attorney's fees. But the statute has apparently been construed by the Massachusetts court as covering only the attorney's fees allowed in the bill of costs, thus distinguishing attorney's fees from counsel fees. See Blake v. Corcoran, 211 Mass. 406, 407, 97 N. E. 1002, and cases cited.,

[6] We must accept the interpretation put upon this statute by the Massachusetts court of last resort. Attorney's fees taxed as costs under the fee table applicable in this court are $20 each. But it is not entirely clear that a lien for these attorney's fees would lie against any interest other than that of Cheney. Gregory v. Pike, 67 Fed. 837, 843, 15 C. C. A. 33. Our decision as to the rights of the second mortgagees shows that Cheney had at this time no equity of any real value. We do not, however, for reasons hereinafter given, find it necessary to determine whether a lien for attorney's fees lies against the judgment.

Perhaps the claim of Turner and Child for a lien for their disbursements, aggregating $1,381.77, might, assuming that Cheney had a valuable interest in the property, or that the lien lies against the judgment without regard to Cheney's real interest therein, be maintained. The Massachusetts decisions on this point are not entirely decisive. Compare Sears v. Nahant, 215 Mass. 234, 102 N. E. 491, Ann. Cas. 1914C, 1296; Boston & Albany R. R. Co. v. Charlton, 161 Mass. 32, 36 N. E. 688; Burrage v. Bristol, 210 Mass. 299, 96 N. E. 719; Stewart v. Finkelstone, 206 Mass. 28, 38, 92 N. E. 37, 28 L. R. A. (N. S.) 634, 138 Am. St. Rep. 370; Stockbridge Iron Co. v. Iron Works, 102 Mass. 80, 89.

But this point, also, we find it unnecessary to determine. We advert to it only to make the ground of our decision, as hereinafter stated, entirely clear.

[7] It is also urged in behalf of Turner and Child that their fees may be charged against the fund under the principle recognized by the Supreme Court of the United States in Hobbs v. McLean, 117 U. S. 567, 582, 6 Sup. Ct. 870, 29 L. Ed. 940, and Trustees v. Greenough, 105 U. S. 527, 532, 26 L. Ed. 1157. See, also, Davis v. Bay State League, 158 Mass. 434, 33 N. E. 591. That principle is that:

"When many persons have a common interest in a trust property or fund, and one of them, for the benefit of all and at his own cost and expense, brings a suit for its preservation or administration, the court of equity in which the suit is brought will order that the plaintiff be reimbursed his outlay from the property of the trust," etc.

Doubtless there is a fairly close analogy between the cases in which this principle is asserted and the situation at bar. But we are not

convinced that the principle is applicable. A part of the services of Turner and Child were rendered in the jury trial. This was a law suit. It was not a suit in equity. Compare Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449; Cherokee Nation v. Southern Kansas Railway Co., 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Metropolitan Railroad Co. v. District of Columbia, 195 U. S. 322, 25 Sup. Ct. 28, 49 L. Ed. 219.

At the jury trial Turner and Child appeared nominally for Cheney. Cheney had not a common interest with the mortgagees and attaching creditor. He was, or was alleged to be, the debtor of all the other claimants. Although obviously insolvent, he had a right, perhaps a duty to his creditors, to take steps proper to insure a fair valuation of the property which the government contemplated taking. We therefore cannot hold that the services rendered by Turner and Child at the jury trial were rendered for the preservation or administration of a property in which Cheney and the claimants had a common interest.

Services rendered by Turner and Child after Cheney was adjudicated a bankrupt may, and we think do, rest upon a different basis, which will be hereafter referred to.

[8-10] But we think there is a plain and tenable ground upon which payment of these claims for fees and disbursements may be ordered out of this fund.

The District Court ruled:

"That the effect of the proceedings and the agreements of counsel in reference to the apportionment of the verdict between the different claimants was to substitute the presiding judge for the jury in the decision of those questions; that the payment of the value, as found by the jury, into court by the United States, was done with the assent of all parties in interest, for the simplification of the proceedings, and in order that the money might be readily available; that it was not intended to alter, and did not in any way alter, the rights of the parties from what they would have been, if a full and formal verdict apportioning the value among the different claimants had been returned by the jury at the trial.

"Upon the foregoing findings and rulings, I further rule that I have no power to allow counsel fees out of the money in the clerk's hands. If I had such power, I should unhesitatingly allow the fees and expenses of Mr. Child in the sum of $3,431.77 and Mr. Turner in the sum of $2,950, as, from my knowledge of the litigation, I believe them to be reasonable and proper. This is also the view of counsel for Mr. Woodard, for Mr. Ross, and for the attaching creditor, J. R. Whipple Company, who make no objections to said amounts.

"In my opinion the payment of these fees rests between counsel and client. As against Mr. Cheney, counsel would have their lien on the amount coming to him, and, there being no question as to the propriety of the amounts charged, this lien would not be lost by the substitution of the trustee in bankruptcy in place of Mr. Cheney."

Apart from other grounds, it is difficult to see how the court could be without power to allow counsel fees "out of the money in the clerk's hands," when, as the court found, it was the view of counsel of both the second mortgagees and of the attaching creditor that the claims were reasonable and proper, and that they made "no objection to said amounts." This falls little, if anything, short of being an express agreement, made in open court by the parties otherwise entitled

to the fund, that these fees and disbursements should be paid therefrom. But if this language is not to be construed as a finding of such express agreement, then we think the District Court construed its power too narrowly. The proceedings before the court were not, as already indicated, legal. They were equitable. The distribution of this fund was a proceeding in equity. This is now conceded by all counsel. As already pointed out, it is immaterial, so far as the present questions are concerned, that a separate bill in equity was not filed and docketed as a suit in equity. Under no statutory or purely legal proceedings could any of the alleged rights of the attaching creditor have been considered. Nor could the conflicting rights of the second mortgagees accruing out of the alleged obligation to apply in payment the proceeds of other security have been left to the jury sitting to appraise the value of this land. The proceedings were equitable. Wood v. Westborough, 140 Mass. 403, 5 N. E. 613; Bates v. Boston El. St. Ry., 187 Mass. 328, 72 N. E. 1017.

As indicated above, if we enforced strict rules of procedure, all the parties would go out of court. None of them is in a position to assert the inapplicability of the equitable maxim that "he who seeks equity must do equity."

Our decision as to what rights Turner and Child have to compensation and reimbursement from this fund must turn mainly upon the acts of the parties subsequent to Cheney's adjudication in bankruptcy in January, 1918. The jury trial had during the previous summer determined no rights in the land nor in the fund, as a finality; its result was merely to indicate to the representatives of the government that the property could probably not be obtained, except at a very large increase over the value of about $22,000 placed thereon by the government's witnesses. After Cheney was adjudicated a bankrupt, all control of the proceedings by him or in his behalf of course ended. The trustee in bankruptcy, representing all creditors, secured and unsecured, took thereafter such control of the proceedings as did not belong to the mortgagees and the attaching creditor. Meddaugh v. Wilson, 151 U. S. 333, 342, 14 Sup. Ct. 356, 38 L. Ed. 183. Turner and Child, thereafter, acted for the trustee in bankruptcy, or for all parties prospectively interested in the fund, including themselves, in dealing with the government's representatives as to the bill of exceptions, and in negotiations which finally, by consent of all the parties, resulted in the agreed judgment of July, 1918. If the proceedings had followed the provisions of the Revised Laws of Massachusetts, c. 1, § 7, to the value determined by the jury as of July, 1917, would have been added "costs and reasonable expenses to be taxed by the court." B. & A. R. R. v. Charlton, 161 Mass. 32, 36 N. E. 688. Whether also interest would have been added is an arguable question. Cf. Burt v. Merchants Insurance Co., 115 Mass. 1.

In United States v. Nahant, 153 Fed. 520, 82 C. C. A. 470, this court held that:

"Where the United States in its sovereign capacity exercises its arbitrary power to condemn private property for necessary public use, the just compensation which it is required by the Constitution to make to the owner

should be determined on equitable principles, and should be such as to put the owner in as good condition pecuniarily as he would have been if the property had not been taken."

But compare U. S. v. Weiner, 210 Fed. 832, 835, 127 C. C. A. 382.

Plainly this principle would require payment by the United States of Child's and Turner's claims, and perhaps interest from the date of the original petition, if we assume that the verdict represented only the fair value of the property.

We find it unnecessary to decide whether, if the government had in July, 1918, accepted the verdict, with all its legal incidents, and had paid the amount thus determined into court, pursuant to the written stipulation made on July 27, 1917, Child and Turner would or would not have been entitled to receive out of the fund, augmented by costs and expenses, their proper fees and disbursements. Cf. B. & A. R. R. v. Charlton, 161 Mass, 32, 36 N. E. 688; Blake v. Corcoran, 211 Mass. 406, 97 N. E. 1002. Obviously, as Cheney had not made the advances or paid for the services, if any allowance therefor had been added to the verdict of the jury, his trustee in bankruptcy would not have been entitled to receive the money. Such allowance, if made, would have belonged to Child and Turner, who had made the advances and rendered the services. For present purposes it is enough to note that a claim for such reimbursement and payment was fully justified, and, if insisted upon, might have ended the negotiations with the government's representatives and prevented the payment of the sum of $46,500 into court. Otherwise stated, Cheney's trustee in bankruptcy and Turner and Child at that time waived a substantial claim of right in order to bring about an accord between the representatives of the government and the other parties in interest, and thus to bring this fund into court, directly for the benefit of the claimants, and indirectly for the benefit of Cheney's unsecured creditors. The total result was that it was agreed that all the claimants should waive any rights and claims inconsistent with the acceptance of the verdict of $46,500, without interest, and without costs and expenses, and that a judgment should be entered upon this verdict as a basis of condemnation proceedings, so that title to the property might vest in the United States. Prior to the condemnation decree, both Turner and Child had by their petitions formally notified both the court and the other parties in interest that they would claim reimbursement out of the fund. It was in the face of this claim, and in order to get the fund into court for the common benefit of all parties for whom Turner and Child were then really acting (including themselves), that all of the claimants waived the right of appeal from the decree of condemnation and agreed to accept this fund as full satisfaction of all claims against the United States.

It is clear that Turner and Child did not, when they agreed that the fund, unaugmented by any allowance for costs and expenses, should be paid into court, intend to waive their claim for compensation out of the fund. Quite the contrary; for, before the decree was made they asserted their right to be paid out of the unaugmented fund. Whether the other claimants did or did not expressly, or in their own minds,

assent to the contention thus made by Child and Turner, they accepted the benefit of the present payment of the fund into court, knowing that Child and Turner relied on that fund, unaugmented, for reimbursement and compensation.

On this state, of facts we think that all the parties in interest then and thereby agreed that the court, as an equity court, should distribute the fund to the parties justly and equitably entitled thereto, including proper compensation to Turner and Child for their services in making the fund available. Cheney's trustee in bankruptcy, representing, in a certain capacity, all the creditors, concedes that the full amount of their fees should now be paid out of the fund in court.

Our decision is grounded on the peculiar facts of this case. The record is most extraordinary. Its unsual and anomalous character grows in part out of the ill-adapted and curious statutory proceedings then applicable in this district to land takings by the United States, in part out of Cheney's financial complications and the conflicting interests among his various creditors, and in part out of the failure of counsel to assert the claims of their clients in more orderly fashion. Counsel are all of experience and competency. We take the situation as we find it, dealing as best we may with this anomalous record. We conclude the court has power to do what ought to be done—order the payment from the fund of fees and expenses agreed by all to have been properly rendered and paid and of advantage to all parties in interest.

We repeat that we ground our decision upon the situation created by the acts and agreements of the parties. We think that Ross, Woodard, and the J. R. Whipple Company are, by their conduct, under the peculiar circumstances of the case, estopped to deny the right of Turner and Child to be compensated out of this fund.

In Meddaugh v. Wilson, 151 U. S. 333, 14 Sup. Ct. 356, 38 L. Ed. 183, the Supreme Court dealt with a case involving counsel fees, not unlike the one now at bar. The facts in that case are very complicated, and the opinion by Mr. Justice Brewer elaborate and lengthy. The case cannot be briefly stated. But the court there held, under conditions fairly analogous to those now presented, that counsel who had rendered services inuring to the benefit of the parties ultimately held entitled to the fund were in equity entitled to compensation out of the fund itself. That decision goes, as does our decision, upon the peculiar facts of the case—really upon the necessarily implied agreements and understandings of the parties.

The case in its complications and peculiarities also bears some analogy to that with which the court dealt in Edwards v. Bay State Gas Co. (C. C.) 172 Fed. 971, 976, et seq. In that case, dealing with the claims of counsel for services and disbursements in the intervening proceedings, the court grounded its allowance therefor upon a compromise decree which, as was there held, implied an agreement of the parties "to reimburse the services and disbursements of the counsel for the interveners in such sums as they might properly have charged their clients."

Our decision goes upon similar or analogous grounds.

?] We come now to consider the claim of Samuel Ross. The
_ concerning the origin and nature of this claim is, if possible,
.1 more confused and confusing than as to the Turner and Child
.aims; but analyzing it as best we may the controlling facts we find
to be as follows:

In June, 1913, Carlisle & Co. were indebted to the appellant Ross
for about $60,000 for money loaned for which his only security was
some worthless "Pay as you enter car stock." They then had posses-
sion of two $15,000 notes made by Benjamin P. Cheney, one dated
March 25, 1913, payable six months from date to the order of Car-
lisle & Co.; the other dated November 10, 1913, payable on demand
after date to himself, and apparently indorsed by himself. Carlisle
& Co. also had 30,000 shares of Argonaut Consolidated Mining Com-
pany stock.

On June 12, 1913, Carlisle & Co. sought to get a new loan of $30,-
000, and addressed a letter to O. G. Staples, Samuel Ross, and Henry
F. Woodard, as follows:

"Gentlemen: This is to affirm that I have in possession and will place
with you in the next twenty-four (24) hours, two (2) fifteen thousand dollar
($15,000.00) notes, made by Benjamin P. Cheney of Boston, and also to affirm
that I am to pay off a loan now due by us in New York, which will release
30,000 shares of the Argonaut Consolidated Mining Company, which said
stock I undertake to deliver in your hands not later than Saturday, June
14th; and I hereby agree that you shall have a specific lien on all of the
above for an advancement of thirty thousand dollars ($30,000.00), this day
made by the three of you to the firm of Carlisle & Co., in amounts as follows:

O. G. Staples.......................................$16,009.50
Samuel Ross ........................................ 7,389.66
Henry F. Woodard ................................. 6,600.84

"It is further understood and agreed that the Argonaut Consolidated Mining
Company's stock, above mentioned, shall stand as security for the obliga-
tions of Carlisle & Co., due by Carlisle & Co. to the three gentlemen above men-
tioned, in the proportions above stated, and also for any other indebtedness
due, or to become due, by Carlisle & Co. to the three aforesaid gentlemen.

"Very respectfully,                              A. H. Carlisle,
                                                "Carlisle & Co."

The letter was not in terms acted upon. It has been treated by the
parties as though formal written evidence. In some of the briefs it is
referred to as a contract. Of course it was not a contract. The letter
proposed that Staples should advance $16,009.50 of the contemplated
$30,000 loan. For some reason now immaterial, Staples dropped out
of the transaction entirely; but, as a result of negotiations of which
this letter was only a part, Ross and Woodard agreed to advance and
did advance each $15,000. Each received therefor one of the Cheney
$15,000 notes and 15,000 shares of the Argonaut stock. Ross tes-
tified, and we find nothing in the record to contradict his testimony:

"That he advanced $15,000 to Carlisle & Co. on June 12, 1913, receiving as
security 15,000 shares of the Argonaut Consolidated Mining Company and
the $15,000 note of Mr. Cheney; that at that time Carlisle & Co. already owed
him about $60,000 for moneys loaned for which his only security was pay as
you enter car stock, which was worthless; that before he agreed to loan
the additional $15,000 he stipulated that he should receive the Argonaut stock
as collateral and that it should be security for the old loan; that he did not

see Mr. Cheney in connection with the transaction, but that Carlisle had the Cheney notes in his possession."

The Cheney note that Ross took was indorsed by Carlisle & Co. It does not appear that for this $15,000 alone Ross had any other direct written promise by Carlisle & Co. to pay the $15,000 loaned them by Ross. But we fail to see on what theory any other obligation can in any aspect of the case be deemed necessary. The indisputable facts are that Ross loaned $15,000 to Carlisle & Co., taking as part of the transaction the Cheney $15,000 note indorsed by Carlisle & Co., as well as 15,000 shares of Argonaut stock. From time to time thereafter, Ross received $21,000 in dividends upon the Argonaut stock and applied these dividends in partial satisfaction of the old obligations of Carlisle & Co.

As already indicated, these $15,000 notes, when handed over by Carlisle & Co. in June, 1913, to Woodard and Ross, were not mortgage notes.

But under date of July 29, 1914, Cheney executed to Woodard and Ross a second mortgage on the premises in question. The material part of the condition of this mortgage is as follows:

"Provided nevertheless that if I, or my heirs, executors, administrators, or assigns, shall pay unto the grantees, or their executors, administrators, or assigns, the sum of thirty thousand (30,000) dollars with interest, as evidenced by two promissory notes of fifteen thousand (15,000) dollars each, bearing interest at the rate of 6 per cent. per annum, signed by me, one dated March 25, 1913, payable to Carlisle & Co., or order, and now held by said Samuel Ross, and the other dated November 10, 1913, payable to the order of myself, and now held by said Henry F. Woodard, in two years from this date, and shall also pay all costs and reasonable counsel fees incurred and to be incurred by said grantees in connection with the collection of said notes, and shall also pay said interest semiannually on said notes from their respective dates."

Although both of these notes were at the time of the execution of the mortgage overdue, the condition of the mortgage, it will be noted, was that they should be paid, with interest, in two years from the date of the mortgage, July 29, 1914.

The notes were not paid by July 29, 1916, and under date of October 19, 1916, the following agreement of extension was made:

"Whereas, under date of March 25, 1913, Benjamin P. Cheney executed his certain note for the sum of fifteen thousand dollars ($15,000) payable six months after date to the order of Carlisle & Co.; and whereas, at the maturity of the said note the same was duly protested for nonpayment;

"And whereas, on the 10th day of November, 1913, the said Benjamin P. Cheney executed his said note for the sum of fifteen thousand dollars ($15,000) payable on demand after date;

"And whereas, the said notes were thereafter secured by certain mortgages and deed dated respectively the 29th day of July, 1914;

"And whereas, it is the intention of the parties hereto to extend the said notes, so that the same will be due and payable on the 1st day of January, 1917:

"Now, therefore, in consideration of the sum of one dollar in hand paid to the said Benjamin P. Cheney by Henry F. Woodard and Samuel Ross, the said Benjamin P. Cheney hereby undertakes, promises, and agrees to pay the said notes on the 1st day of January, 1917, together with the accumulated unpaid interest thereon.

"And in consideration of the sum of one dollar in hand paid to the said Carlisle & Co. by Henry F. Woodard and Samuel Ross, the said Carlisle & Co. hereby undertakes, promises, and agrees to pay the said notes upon the failure of the said Benjamin P. Cheney to pay the same.

"Witness the signatures and seals of the said Benjamin P. Cheney and the said Carlisle & Co. this 19th day of October, 1916.

"Benjamin P. Cheney. [Seal.]

"Carlisle & Co. [Seal.]"

Prior to this date of October 19, 1916, Ross had received in dividends from the Argonaut stock $15,000 and had applied the same in partial payment of the old obligations of Carlisle & Co. There is nothing in the record warranting the court in finding that this payment and application were not known and assented to by both Carlisle & Co. and Cheney, assuming, but without holding, that such knowledge and assent were necessary. Nevertheless, we find both Carlisle & Co. and Cheney on October, 1916, reaffirming their previous obligation to pay these notes, Cheney as principal and Carlisle & Co. as guarantor.

But the District Court ruled, on what ground we have difficulty on this record in understanding, that Ross' agreement with Carlisle & Co. clearly bound him to apply the dividends received on the Argonaut stock in the first instance to the indorsement of Carlisle & Co. on the Cheney note; that consequently these dividends, aggregating $21,000 in all, should be held as having paid the Cheney note, so that Ross was not entitled as second mortgagee to share in the fund now in court.

As above indicated, we regard it as error to treat the letter of June 12, 1913, as though a contract or a formal written offer, which, when accepted, even if orally, would constitute a contract. It was nothing but a part of the negotiations between Carlisle & Co., and Ross and Woodard for the $30,000 loan, which happened to be in writing. But, even if it were, as it is not, a contract or a written offer which by mere acceptance should be construed as a written contract, we find nothing in it requiring Ross to apply dividends received on the Argonaut stock primarily to the payment of the obligation of Carlisle & Co. on the Cheney note. The import of the paper seems to us almost exactly the reverse. By it Carlisle & Co. proposed to the contemplated lenders (then three) that the Argonaut stock should secure not only the new loan, but also "any other indebtedness due or to become due by Carlisle & Co. to the three aforesaid gentlemen." Ross was one of the "three aforesaid gentlemen." There was then "other indebtedness due" him of about $60,000. The proposition, therefore, was in plain and explicit terms that he should hold the Argonaut stock as security for this old debt. Of course he was entitled to enforce the Cheney note according to its terms against Cheney, the maker, and Carlisle & Co., the indorser. When, later, the Cheney note was secured by the second mortgage, Ross had the same right to enforce that mortgage security that he had to demand payment of the note from Cheney.

Otherwise stated, after Ross made the new advance of $15,000 to Carlisle & Co. on the security of Cheney's $15,000 note, and the 15,-

000 shares of Argonaut stock, he became entitled to enforce for his aggregate loan of $75,000 all his security.

There is nothing either in the situation or in his agreement to deprive him of the usual right of a creditor holding security generally applicable to all his loans to apply the proceeds of any such securities primarily in satisfaction of debts not otherwise secured. Bankers' Surety Co. v. Maxwell, 222 Fed. 797, 802, 138 C. C. A. 345; George H. Sampson Co. v. Commonwealth, 208 Mass. 372, 375, 94 N. E. 473; National Bank v. Peck, 127 Mass. 298, 301, 34 Am. Rep. 368, and cases cited.

One obvious motive on Ross' part for making the new loan was to get, not only Cheney's $15,000 note, presumably then regarded as good, but also the Argonaut stock, as security for his otherwise unsecured $60,000 debt.

The nature of the transaction, as well as Ross' uncontroverted testimony, supra, "that before he agreed to loan the additional $15,000 he stipulated that he should receive the Argonaut stock as collateral, and that it should be security for the old loan," both require us to hold the District Court in error in holding Ross' $15,000 note paid.

Our conclusion is therefore that, when Ross received by way of dividend from the Argonaut stock $21,000, he was entitled to apply, as he did apply, this sum in diminution of the old debt of $60,000, without affecting his right to enforce the Cheney note and the mortgage for the full amount, with interest thereon, at the agreed rate of 6 per cent.

After the order of distribution made by the District Court on February 7, 1919, there was paid by agreement to the town of Hull and to the first mortgagees, in the aggregate, $15,291.60, leaving the fund now remaining to be distributed $31,208.40. Woodard's claim was allowed, including interest, in the sum of $12,306.49. From this we infer that a substantial payment had been made on account of Woodard's original claim, which was $15,000 of principal. How much of the sum of $12,306.49 was principal, and how much interest, does not appear.

The order of distribution made by the District Court must be vacated, and a new order of distribution made, under which the fees and disbursements of Turner and Child, aggregating $6,331.77, must be charged as prior in right to the claims of Woodard, Ross, and the J. R. Whipple Company. Whether Turner and Child are entitled to any interest, and, if so, from what date, and upon what amounts, has not been argued and cannot be determined on this record. Failing agreement on this point by the parties, the case may stand for further hearing on the question of interest before the District Court.

The decree disallowing the claim of Ross must also be reversed. We infer, although the record is not conclusive, that Ross has had no payment of interest on his new loan of $15,000 since it was made on June 12, 1913. Even without allowing him interest, the fund, after the payment of the amounts due Child and Turner, will apparently be inadequate to pay in full the amount due Woodard and Ross. The second mortgage, when given, secured them equally in equal sums. Any shortage now arising in the application of the proceeds of the

security must therefore be borne equally. The case may stand, if necessary, for further hearing in the District Court upon the amount payable to Woodard and Ross, either or both, principal and interest, in accordance with this opinion.

In each case the decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs in this court to the appellants.